B. E. REYNOLDS *v.* VIRGINIAN RAILWAY COMPANY

(No. 8146)

Submitted May 1, 1935. Decided May 28, 1935.

*Sanders & Crockett* and *Walter G. Burton,* for plaintiff in error.

*John R. Pendleton,* for defendant in error.

KENNA, JUDGE:

B. E. Reynolds brought this action in trespass on the case against the Virginian Railway Company in the circuit court

of Mercer County. The declaration is framed under the Federal Employers' Liability Act. To an order of that court, entered December 20, 1934, setting aside a verdict in the sum of $15,000.00 in favor of the plaintiff and awarding the defendant a new trial, the plaintiff prosecutes this writ of error.

The proof of the plaintiff shows that Reynolds was injured on the 1st day of September, 1933, when the rigging of a scaffold, from which he was repairing the inside brick wall of one of the great boilers maintained by the defendant at its power plant at Narrows, gave way. Reynolds and his helper were precipitated to the floor of the boiler some 25 or 30 feet below. Reynolds was rendered unconscious and was severely hurt, particularly at the left elbow which sustained a fracture. In mending, the new bone substance formed at the fracture incased the ulnar nerve and the pressure on it caused partial paralysis of the arm and almost complete paralysis of the little and ring fingers on the left hand. Relief was attempted by manipulation under an anesthetic, and later, surgery was resorted to in order to free the ulnar nerve, resulting in considerable improvement, but not achieving the result that was hoped. The probable permanent result is that there is present some paralysis in the left hand, and that the movement at the left elbow is restricted so that the injured man cannot get his hand to his mouth. Reynolds' ability to perform manual labor is estimated at approximately fifty per cent of what it was before the injury.

Reynolds had been employed at the Narrows plant of the Virginian Railway Company as a helper to the blacksmith whose duty it was to care for and repair the five boilers in its power plant, for a period of three to four years. About eighteen months before the date of his injury, the blacksmith whom he had been assisting died and Reynolds was placed in charge of this work, the proof showing that he had no direct foreman other than the general manager of the plant. On or about July 24, 1933, the brick lining of the boiler in which Reynolds was hurt had become out of repair and the duty had devolved upon Reynolds and his helper to repair it. It was the custom and practice for Reynolds to take charge of and perform this repair work without the direct supervision

of anyone. In doing so, he had been accustomed to erect scaffolds in substantially the same manner as that which he erected in order to perform the repair work that was being done at the time of his injury. Reynolds and his helper prepared a platform, the flooring of which was made from either two-by-fours or two-by-sixes and which was about eighteen inches wide by sixteen feet long. The boards constituting the floor were spiked together from the underside with cross-pieces of two-by-fours. The tackle by which this platform was suspended consisted of a set of blocks or pulleys at each end. Four courses of the rope used were passed through these blocks. Hooks were set in the blocks and at the upper end these hooks were passed through loops or slings of rope five or six feet long, the dead ends of which were tied with a "half hitch" knot at the top after having been passed over a pipe which was rested upon the upper tubes of the boiler. The upper loop or sling of rope passed between the boiler tubes for a distance of four or five feet so that the hook at its lower end was only a matter of a few inches below the lower tubes. At the lower end, the two courses of rope forming the loop had been brought together and wrapped with wire just above the hook to prevent slipping. A single course of rope passed around the hook. Slings, or loops, of rope were also arranged at the lower end of the tackle by which the platform was connected with the blocks at that end. The rope was simply wrapped around the flooring, or platform, inside the cross-pieces of two-by-fours spiked on the underside of the platform, and formed into a loop passing over the hooks of the lower blocks.

It appears that sometime in the latter part of July, Reynolds and his helper had prepared the platform for their scaffold, and evidently had the blocks in readiness inside the boiler. Reynolds testified that he had been accustomed to using one inch or one inch and a quarter size rope in preparing the tackle for his scaffolds. On this occasion, he says that he called the storeroom of the power plant and asked for new rope and was told that there was none on hand. He then went to Cleve Bowser, general manager of the plant, who, he testifies, took him to the tool room and there gave him some

used three-quarter inch rope, stating that it would do for the purpose, and for him (Reynolds) to take it, double it, and use it. Reynolds testified that he demurred to this, stating to Bowser that the rope did not ''look good'' to him, but that he did take it, relying upon Bowser's judgment. Reynolds states that the rope appeared to be dirty and worn and that it had one bad place in it, which he, at the suggestion of Bowser, cut off. This proof of the plaintiff concerning the getting of the rope from Bowser is flatly contradicted by the latter's testimony, but inasmuch as the plaintiff's version is that which must be accepted upon a motion of the defendant to set aside the plaintiff's verdict, we do not recount the testimony in contradiction. Both the courses of rope above the upper block on the left end of the platform broke, one parting being a few inches above the other, and both just below the point where the rope went into the boiler tubes some four or five feet beneath the point where the sling, or loop, of rope went over the pipe resting upon the boiler tubes. This occurred September 1st, some five weeks after the scaffold had been put up.

In contending that the trial court wrongfully set aside his verdict, the plaintiff here states that in taking the rope and putting in the tackle for his scaffold he was acting pursuant to, and in reliance upon, the direct instructions of his superior, and that consequently there was no assumption of risk, and that under the Federal Employers' Liability Act, contributory negligence does not defeat recovery.

In contending that the trial court was justified in setting aside the verdict in favor of the plaintiff, the defendant in error states that Reynolds was in charge of the work of putting up the scaffold; that he was responsible for its safety and that his conduct in accepting the rope from Bowser, even upon the plaintiff's theory, imposed upon him all of the risks incident to its use because whatever danger there was in the use of the rope was as evident to him as it was to Bowser, and that by analogy to the ''simple tool'' doctrine, the defendant owed him no duty of inspection as to the rope. The defendant also points out the refusal of the trial court to give its instruction No. 4, as being such error as would justify

setting the verdict aside. One of the grounds assigned in the trial court on the motion to set aside the verdict was that the verdict was excessive, but since this point is not briefed nor insisted upon in this court, we do not deal with it.

The rule is that where a scaffold, or like apparatus, is not furnished by the employer in its completed form for the use of the workman, but its construction is left to the workman himself, all risks incident to the manner of construction become ordinary risks of the employment and are assumed by the workman, the master's duty in the premises being discharged if he uses reasonable care to furnish an adequate supply of material suitable and safe for the purpose intended. *McCone* v. *Gallagher,* 16 App. Div. 272, 44 N. Y. Supp. 697; *Brady* v. *Norcross,* 172 Mass. 331, 52 N. E. 528; *Richards* v. *Hayes,* 17 App. Div. 422, 45 N. Y. Supp. 234; *Williams* v. *Ransom,* 234 Mo. 55, 136 S. W. 349; *Kimmer* v. *Weber,* 151 N. Y. 417, 45 N. E. 860, 56 Am. St. Rep. 630; *Martin* v. *Morris,* 59 App. D. C. 19, 32 Fed. (2d) 410. Under the rule stated, sustained by the cases cited and many more analogous in principle, we are of the opinion that the proof in this case establishes in the first instance that the injury resulted from a risk assumed by the workman. But it is contended for the plaintiff that Reynolds was acting upon the orders and assurances of his immediate superior in using the particular rope furnished to him, and in using it in the manner that he did. Whereas, the initial burden of showing assumption of risk rests upon the employer, the burden of taking the risk out of the category of those assumed, when it would otherwise belong there, by showing that the thing done causing the injury was in response to, and in obedience of, instructions of the employer, rests upon the employee. The question, then, is whether Reynolds has shown that he received direct orders from his superior and that his injury resulted from carrying out those orders as given. According to his own testimony, Bowser told him to take the rope, double it and use it. There is no complaint as to the quantity of rope that he received. We do not think that there is any doubt but that the instructions of Bowser plainly meant that two courses of rope were to be used in the construction of the scaffold at all points

where one course of rope had been used before. Otherwise, the idea of doubling the rope would be futile, because the sustaining power of the tackle as used by Reynolds would be no greater than the strength of its weakest point. Four courses of rope were used by Reynolds between the blocks at the respective ends of the scaffold, but only two courses were used in making the loops, or slings, of rope by which the upper block was suspended from the pipe above, and but one course of rope passed under and around the hooks. These slings, or loops, of rope were constructed with the least amount of rope, giving the least sustaining power of the rope used, that was possible in making a device of that kind. When asked on cross-examination why he had not used four courses of rope in making the slings, or loops, as he had done in making the tackle between the blocks, Reynolds replied that he had not done so because he had never done it before. It is true that he did state that in constructing the loops, he had carried out Bowser's instructions explicitly, but we believe that this conclusion of the witness is not borne out by the verbatim instructions of Bowser as testified to by Reynolds himself. Apparently, Bowser knew, and certainly Reynolds knew, that the rope that was furnished him was three-quarter inch rope, whereas, the rope that he had been accustomed to using for the same purpose was either one inch and a quarter rope or one inch rope. In the light of this admitted fact, the instructions of Bowser to double the rope in constructing the scaffold could have only one sensible meaning. That meaning, because of the fact that smaller rope was to be used, was to take the precaution of using double the amount of rope customarily used at all points in the construction of the tackle. On no other theory could the precautionary part of Bowser's instructions, as testified to by Reynolds, be given practical effect. We therefore are of the opinion that Reynolds has failed to show that in the use of the rope, he carried out the instructions of his superior as given. This being true, those instructions furnish plaintiff no protection against the application of the doctrine of assumed risks. *Jenney Electric Light & Power Co.* v. *Murphy,* 115 Ind. 566, 18 N. E. 30; *Wiggins Ferry Co.* v. *Heilig,* 43 Ill. App. 238. Since, from the fore-

going considerations, we find that the record contains justification for the action of the trial court in setting aside the verdict for the plaintiff, we do not discuss other grounds in justification of that course assigned by the defendant in error. We are of the opinion that the order of the trial court must be affirmed.

*Affirmed.*